**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| **STACY SILVER** | **CASE NO.  2:23-CV-00701** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **USA ET AL** | **MAGISTRATE JUDGE LEBLANC** |

## MEMORANDUM RULING

On May 11 and May 28, 2026, the court held a two-day bench trial on plaintiff Stacy Silver's claims of personal injury against the United States of America under the Federal Tort Claims Act ("FTCA"). Having considered the evidence and applicable law, as well as the post-trial memoranda submitted by the parties, the court now issues its ruling.

### I.
### BACKGROUND

This suit arises from a motor vehicle accident that occurred on August 23, 2021, in Lake Charles, Louisiana. Doc. 1. On that date plaintiff Stacy Silver was a passenger in a vehicle traveling on Nelson Road when she was rear-ended by John Dorsey, a FEMA employee driving a government-owned vehicle. Ms. Silver filed an SF-95 form, seeking to recover for bodily injury claims in the amount of $1,000,000.00. Doc. 1, ¶ 12; doc. 55. After the government failed to issue a formal response within six months, Ms. Silver filed suit in this court against the United States under the Federal Tort Claims Act ("FTCA") on May 26, 2023. Doc. 1. The administrative process concluded without settlement. Doc. 55. The government has admitted that Mr. Dorsey was acting within the course and scope of

his employment with FEMA at the time of the accident. Doc. 55. Plaintiff's claim thus falls under the FTCA.

The matter proceeded to a bench trial, where the government contested the extent of Ms. Silver's damages. After considering the testimony of witnesses and exhibits entered into evidence, as well as the post-trial briefs filed by both parties, the court now makes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## II.
### FINDINGS OF FACT & CONCLUSIONS OF LAW

### A. The Accident

#### 1. Evidence adduced at trial

At the time of the accident Ms. Silver was a front-seat passenger in a Nissan Versa driven by James Sims, her then-husband. They were on their way to a medical appointment, traveling down Nelson Road in Lake Charles, Louisiana, and Mr. Sims testified that he slowed the vehicle to a complete stop as they approached a red light, with other vehicles slowing ahead of them. According to both Mr. Sims and Ms. Silver, she was turned toward the back seat and tending to her grandchild.  Mr. Silver testified that their vehicle was at a complete stop for several seconds, up to a minute, before impact. Ms. Silver and Mr. Sims testified that they did not see anything before they were rear-ended by a Chevy pick-up truck driven by Mr. Dorsey. *See* doc. 64, att. 4, p. 12.

Mr. Dorsey did not appear at trial. Investigating Office Ted Oliver with the Lake Charles Police Department testified that he arrived at the scene at 12:02 pm, approximately four minutes after the accident occurred. Doc. 64, att. 4, pp. 10–11. He surmised that Mr.

Dorsey attempted to avoid the collision by veering to the right, but nonetheless struck the vehicle driven by Mr. Sims in the rear. *Id.* at 17–18. He did not issue any citations from the accident. *Id.* at 22–23. Based on his investigation, he determined that Mr. Dorsey caused the accident by being inattentive and following too closely. *Id.* at 21, 23. Photographs of the vehicles show that the Nissan sustained moderate damage on the rear of the passenger side, while the Chevy had scratches and a dent on the driver's side of the bumper and front panel. Doc. 64, atts. 17 & 18.

### 2. Liability

The FTCA, 28 U.S.C. § 2675(a), is a limited waiver of the government's sovereign immunity for certain tort claims brought against employees of the United States under the doctrine of respondeat superior. It provides district courts with jurisdiction over claims based on the negligent or wrongful acts of government employees "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 2675(b). Accordingly, the court applies the tort law of the state where the alleged injury occurred—in this case, Louisiana— to determine the government's liability. *Villafranca v. United States*, 587 F.3d 257, 260 (5th Cir. 2009).

Louisiana courts determine liability for negligence based on a duty-risk analysis. *Long v. State ex rel. Dept. of Transp. and Dev.,* 916 So.2d 87, 101 (La. 2005). Through this test the plaintiff must show all of the following:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard

conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

*Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (citing *Lemann v. Essen Lane Daiquiris,* 923 So.2d 627, 633 (La. 2006)). The percentage of fault of all persons causing or contributing to an injury must be determined by the factfinder. *Hankton v. State*, 315 So.3d 1278, 1282 (La. 2020). In making this determination courts look to the factors set forth in *Watson v. State Farm Fire & Casualty Insurance Company*, 469 So.2d 967 (La. 1985), including:

(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significant of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Id.* at 974.

Under Louisiana law, a driver "shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway." La. R.S. 32:81. "Louisiana courts have uniformly held that a following motorist in a rear-end collision is presumed to have breached the standard of conduct prescribed in La. Rev. Stat. Ann. 32:81 and hence is presumed negligent." *Sede v. Bullock*, 734 F.Supp.3d 524, 528 (E.D. La. 2024) (quoting *Mart v. Hill*, 505 So.2d 1120, 1123 (La. 1987)). Given this presumption, the defendant has the burden

of showing "that he was not guilty of any dereliction, however slight." *Shephard ex rel. Shephard v. Scheeler*, 701 So.2d 1308, 1318 (La. 1997).

Ms. Silver and Mr. Sims testified that their vehicle slowed and then came to a stop with traffic on Nelson Road, a busy thoroughfare in Lake Charles, Louisiana. The court must infer, as the investigating officer did, that the following motorist was inattentive and therefore did not attempt to brake until it was too late. The government has introduced no evidence to shift the blame in this accident. Accordingly, Mr. Dorsey's negligence was the sole cause of the accident and the government is liable for all of Ms. Silver's resulting damages.

### B. Quantum of Damages

#### 1. Treatment history

Ms. Silver was forty-six years old at the time of the accident. *See* doc. 64, att. 12, p. 9. She sought treatment for neck and lower back pain at the Christus Lake Area Hospital emergency room on the day of the accident. *Id.* at 5–12. She received an X-ray of her neck and was diagnosed with cervical muscle strain. Doc. 64, att. 12, p. 12. The next day she went to Lake Charles Memorial Hospital ("LCMH") for ongoing pain and more X-rays were taken. *See* doc. 64, att. 13, p. 21. She sought care at West Calcasieu Cameron Hospital ("WCCH") in Vinton, Louisiana, where she resided, the following week. *Id.* At this visit she complained of complete back pain with spasms in the lower back. *Id.* She reported that she was told by her attorney to come for an MRI, and that the provider at LCMH had also indicated she might need an MRI. *Id.* at 24. The provider at WCCH explained that Medicaid

was unlikely to cover an MRI at this stage and recommended that Ms. Silver pursue further treatment. *Id.* at 24–25.

Ms. Silver sought chiropractic treatment throughout September 2021. Doc. 64, att. 8. She testified that these treatments only intensified her back pain. She then pursued physical therapy, but testified that her physical therapist made the decision to stop after three or four sessions when her pain had not improved. *Id.* at 38–39. Ms. Silver received an MRI of her lumbar spine on October 19, 2021, and saw Dr. Michael Lane at Allied Health a week later. Doc. 64, att. 6. Dr. Lane recorded that Ms. Silver continued to experience lower back pain, ranging from 5/10 to 10/10, along with numbness, tingling, and weakness in her legs. *Id.* at 4. Her MRI showed disc bulging with superimposed broad-based central disc herniation at L3-L4, along with central canal stenosis. *Id.* at 6. Dr. Lane recommended diagnostic bilateral lumbar medial branch blocks, with radiofrequency ablations to follow if successful. *Id.* at 7–8. He also prescribed chronic opiate therapy. *Id.* at 8.

Ms. Silver underwent an L3/L4 epidural steroid injection with Dr. Seth Billiodeaux on January 10, 2022, and a medial branch nerve block with Dr. Billiodeaux on April 7, 2022. Doc. 64, att. 5, pp. 33, 35. Ms. Silver reported that neither procedure provided any pain relief. She underwent another MRI, which showed "[s]pondylotic disc and endplate change and facet arthropathy . . . at each level [of the lumbar spine] most significant at L3–4." Doc. 64, att. 5, p. 13. She was then referred to Dr. Bharat Guthikonda, a neurosurgeon, for surgical evaluation.

Dr. Guthikonda first saw Ms. Silver on July 7, 2022. Based on Ms. Silver's imaging, symptoms, and record of failing more conservative treatment, Dr. Guthikonda found that she was a surgical candidate and recommended an L3–L4 laminectomy with fusion. Doc. 64, att. 1, pp. 21–28; *see* doc. 64, att. 9, pp. 133–35. Ms. Silver agreed to the procedure after discussing the risks and benefits with Dr. Guthikonda. Doc. 64, att. 9, p. 135. By this time, she testified that the pain was unbearable.

The surgery took place on August 24, 2022, at Willis-Knighton Hospital in Shreveport, Louisiana. Doc. 64, att. 14, p. 3. After the operation, Ms. Silver rated her pain at 8/10 but initially stated that she wanted to go home that day. *Id.* at 148. A few hours later, however, she rated her pain at 10/10 and was admitted for pain management. *Id.* at 148–49. Ms. Silver was discharged from the hospital the following evening. Doc. 64, att. 15, p. 88. She was instructed not to lift anything heavier than ten pounds. Doc. 64, att. 1, p. 33. She saw Dr. Guthikonda again on September 26, 2022, and was advised that she could increase activity and advance the weights she lifted in five to ten pound increments, checking for tolerance. Doc. 64, att. 10, pp. 145–46. At a follow-up visit in December, she complained of weakness in her legs since October and continued back pain. *Id.* at 143. Dr. Guthikonda prescribed physical therapy. *Id.* at 144. According to the testimony of Ms. Silver and Dr. Neil Romero, she pursued another six weeks of physical therapy after her surgery but experienced no relief. Since that time, she testified, she has treated her back pain with medication through her primary care physician, Dr. Van Snider.

Ms. Silver has also sought treatment for depression, anxiety, and PTSD, which she attributes to the accident. She has seen psychiatric nurse practitioner Cain Schexneider for

medication management approximately every three months since March 2022. Doc. 64, att. 11, pp. 5–7. She testified that she had a long history of depression and anxiety, but maintains that the depression worsened after the accident. In April 2022, she was admitted to the hospital for depression with suicidal ideation. Doc. 66, att. 1. The screening summary states, in relevant part:

> Patient was brought to the hospital by her husband for depression with suicidal ideations. Patient reports having depression since childhood. Her treatment for depression started in her early 30s at which time she started taking antidepressant medications. Patient's mood was stable up until her motor vehicle accident in August 2021. With this accident, she injured her back and was unable to work. She had been the breadwinner in the family and therefore finances became a problem. She states "that this is when the depression kicked in." She states she has nerve and disc problems in her back and will likely have surgery next month.
>
> Approximately 1 month ago, the patient was sent to Kane Schexnayder, APRN after patient requested to get off of some of her medications because she felt like she was taking too many. . . . Patient states that her depression was "mild" up until 5 days ago when her husband and she got into an argument. Patient states since that time he has been verbally abusive to her. Apparently, he is drinking alcohol daily anywhere between a sixpack, a 12 pack and 1/5 of whiskey each day and mixes it with his prescribed pain medications. They have only been married for a few months but were best friends for over 25 years. The patient describes him as being verbally abusive and she is now planning to leave him and move in with her father who has Alzheimer's and needs her help. The patient's husband tells her that she is a failure, that she is not worth it and says other cruel things to her including comparing her to his ex-wife who was a prostitute.

*Id.*

## 2. James Sims testimony

James Sims was married to Ms. Silver at the time of the accident. The two married in 2021 but had known each other since 1998. He accompanied Ms. Silver to medical appointments. Before the accident, he testified, Ms. Silver helped her mother at a restaurant

in addition to working as the assistant manager at a convenience store. She was on her feet constantly for both jobs but was unable to return due to the pain. She was also unable to return to activities she had previously enjoyed, like gardening. He attributed their divorce to Ms. Silver's worsening depression and stated that the two are rarely in contact now, despite decades of friendship before their marriage. He denied the heavy drinking and verbal abuse described by Ms. Silver in her hospital records.

### 3. Stacy Silver testimony

Ms. Silver testified that she felt excruciating back pain soon after the accident and that her multiple attempts at treating it failed. Before the accident she worked long hours on her feet as an assistant manager at a convenience store, where she regularly lifted heavy boxes and mopped large areas. During this time she only experienced minor irritation in her back. After the accident, she cannot spend more than ten minutes on her feet.

Her depression has worsened since the accident. Even with her divorce, she attributes 99 percent of her depression to the wreck and states that it was this depression that caused her marriage to deteriorate. The wreck has also impacted her relationship with her grandchildren, because she is no longer able to do the same activities with them. She admitted, however, that she was also diagnosed with bipolar disorder before the accident. She also admitted that she had received treatment for two falls and stepping into a hole and twisting her back since the accident. She currently lives with her mother, where they share the household chores. She is still able to drive locally and do some light gardening.

### 4. Medical opinion testimony

Plaintiff's treating providers Dr. Bharat Guthikonda, Dr. Van Snider, and Cain Schexneider testified via trial deposition. Defendant introduced testimony from its IME expert Dr. Neil Romero.

Dr. Guthikonda testified that he found Ms. Silver was a candidate for the L3–L4 laminectomy with fusion based on her imaging, symptoms, and record of failing more conservative treatment. Doc. 64, att. 1, pp. 21–28. He acknowledged, however, that he had not reviewed her chiropractic or physical therapy records. *Id.* at 50–51. He discharged her with restrictions on lifting anything heavier than 10 pounds and expected she would be able to increase her activity within a month. *Id.* at 33–34. He testified that most patients were fully healed within six to twelve weeks but for some patients the process took longer. *Id.* at 34. He acknowledged that Ms. Silver's smoking could complicate her recovery. *Id.* at 34–35. He also stated that he would defer to the opinion of Ms. Silver's treating physician as to her current limitations. *Id.* at 36. He described the biggest potential complication of Ms. Silver's procedure as adjacent disc syndrome, in which the patient developed the same type of affecting five to ten percent of patients who underwent a disc fusion developed stenosis at the adjacent level. *Id.* at 46–47. He also acknowledged that chronic pain was a possible complication for any spinal intervention. *Id.* He has not seen Ms. Silver since December 2022. *Id.* at 53. Based on her ongoing complaints and reported limitations, he would recommend a functional capacity examination to outline her current abilities. *Id.* at 49–50.

Dr. Van Snider practices as an internist at West Calcasieu-Cameron Community Center. Doc. 64, att. 2, p. 5. He began treating Ms. Silver, who was an established patient at the clinic, in October 2023. *Id.* at 10–11. On her first visit, Ms. Silver complained of headaches, back pain, and leg pain, and mentioned her 2021 motor vehicle accident. *Id.* at 12. She also stated that her symptoms had worsened since her surgery with Dr. Guthikonda. *Id.* at 13. At that visit he determined that she was mobility impaired for purposes of obtaining a handicap placard for her vehicle. *Id.* at 17–20. He saw her again in February and June 2024, during which time she complained of increasing neck pain. *Id.* at 20–26. An MRI of her neck from November 2025 showed abnormalities that Dr. Snider believed were consistent with these complaints. *Id.* at 26–28. Ms. Silver also continued to complain of back pain while seeing Dr. Snider or his nurse practitioner every three months, and he attempted to manage this pain with medication. *Id.* at 29–31, 37–41, 46–48. Based on his treatment of Ms. Silver, he believes that she has chronic neck and back pain arising from the 2021 car accident and that this pain is permanent. *Id.* at 49–51. However, he does not recall reviewing any medical records that predated the 2021 car accident. *Id.* at 54.

Dr. Snider considers Ms. Silver to be permanently disabled and wrote a letter to that effect in February 2024. *Id.* at 51–52. Since that time, he believes that her condition has only worsened. *Id.* As of March 2025, however, Ms. Silver acknowledged that she could still perform all activities of daily living independently. *Id.* at 56; *see* doc. 64, att. 16, p. 65.

Psychiatric nurse practitioner Cain Schexneider began treating Ms. Silver in March 2022. Doc. 64, att. 3, p. 16. He believes that her present mental health issues are an aggravation of her preexisting conditions based on the accident and related stressors. *Id.* at

20–22. He stated that chronic pain could exacerbate both depression/anxiety and the symptoms of her bipolar disorder. *Id.* at 26–27. He also recalled that her inability to work contributed to her depression and anxiety. *Id.* at 39–40. Accordingly, he opined that the crash more likely than not caused or contributed to her need for psychiatric medical care. *Id.* at 40. He admitted, however, that he had not reviewed her prior mental health records except to monitor which controlled substances she had been prescribed within the last ten year. *Id.* at 46–47. He also admitted that she stated during her first post-surgery visit that recovery was going well and that she complained of "everyday life stressors" in addition to her back pain. *Id.* at 51–53. Further, she mentioned the recent death of her father during a July 2024 visit (though she did not believe a change to her medication was needed). *Id.* at 54. Finally, Mr. Schexnaider agreed that Ms. Silver's condition had improved overall by her last visit in December 2025. *Id.*

Finally, Dr. Romero testified that based on his IME Ms. Silver's symptoms were consistent with cervical spine strain and an aggravation of an underlying degenerative lumbar spine condition. For her cervical spine, he believes that only the complaints in the immediate aftermath of the accident were caused by the accident given that she did not complain of her neck again until October 2023, two years later. Upon review of the November 2025 MRI, he noted evidence of a degenerative condition in her neck but nothing consistent with disc herniation or significant stenosis.

For Ms. Silver's lumbar spine, Dr. Romero related Ms. Silver's ongoing complaints to the 2021 accident. He believes the initial surgery might have been avoided with more attempts at conservative therapy. He agrees, however, that the surgery was warranted based

on his examination and review of available imaging. He does not believe that any further surgery is necessary. Instead, he states that she has reached maximum medical improvement with respect to both her cervical and lumbar spine. He also believes that Ms. Silver has only medium duty limitations as a result of her injury and is therefore able to return to her previous occupation, as is typical with patients after a lumbar fusion. He acknowledged, however, that chronic pain complaints are highly subjective and that a functional capacity evaluation could provide more objective evidence. He noted that Dr. Snider had not ordered one, despite Dr. Guthikonda's recommendation.

### 5.  Economic losses

Plaintiff submitted a report from vocational rehabilitation expert Ted Deshotels, who testified at trial. *See* doc. 64, att. 22. She reported eleven months of employment at the EZ-Mart in Starks, Louisiana, ending with the accident in August 2021, and five years before that as an assistant manager at Dollar General. Mr. Deshotels and plaintiff reported her wages as $12.50/hour, working an average of 40 hours a week with occasional overtime. *See* doc. 64, att. 22, p. 10. But her only available tax returns were from 2020 and 2021, the year of the accident. In 2020, she earned $14,242.00 in wages. Doc. 64, att. 20. In 2021, based on nearly nine months of continuous employment at EZ-Mart, she earned $14,667.00. Doc. 64, att. 21. Mr. Deshotels opines that plaintiff is entitled to past lost wages between $21,240.00 and $26,000.00 based on her "pre accident earnings capacity." Doc. 64, att. 22, p. 15. He further opines, based on the opinions of Dr. Snyder and Mr. Schexnaider as well as his own assessment of plaintiff, that she is unable to return to work

due to the limitations caused by her injuries as well as the range of occupations based on her education, experience, and abilities. *Id.* at 15–16.

Plaintiff's economist Dr. Dennis Boudreaux based his calculations on Mr. Deshotels's report as well as plaintiff's hourly wage information. He explained that the higher figure used by Mr. Deshotels was based on a $12.50 hourly wage while the lower was based on a wage of approximately $10.21/hour. Dr. Boudreaux valued plaintiff's past earning loss, through the beginning of trial on May 11, 2026, at $100,040.40 to $122,460.00. He valued her future lost wages based on the same earning capacity and under two scenarios: that she would work to age 61.38 or until age 67.00. The former assumption was based on work-life tables from the Bureau of Labor Statistics, while the latter assumed plaintiff would work until she qualified for her full Social Security benefit. For the former scenario, Dr. Boudreaux calculated future lost wages discounted to present value of $225,665.63 to $276,238.54 and for the latter he calculated $365,183.24 to $477,022.80. *See* doc. 64, att. 23, pp. 7–8. Past medical expenses, as stipulated by the parties, total $170,811.31. *See* doc. 55. Of these, only $27,914.76 may be recovered. *Id.* Neither Mr. Deshotels nor Dr. Boudreaux accounted for any future medical expenses. Doc. 64, atts. 22–23.

The government's vocational rehabilitation expert, Stony Landry, also conducted a vocational evaluation of plaintiff. He opined that under medium duty restrictions, plaintiff would be able to return to her prior employment and suffer no future lost wages. Doc. 68, p. 48. He also offered that under light duty restrictions, she could find occupations such as fast food worker, sales clerk, or cashier that would restore her full pre-accident earning

capacity. *Id.* Under no-work status, however, he agreed that she would suffer a total loss of earning capacity. *Id.*

The government's economist, Dr. John Page, calculated plaintiff's past lost wages based on an annualization of her earned income in 2021. Doc. 69, pp, 86, 93. For this figure, which assumes plaintiff would have worked at the same hours and rate that she had from January 1, 2021, until the date of the accident, plaintiff's past lost earnings are $22,780.74 per year. Dr. Page calculated these only through November 2024, when plaintiff had reached maximum medical improvement according to Dr. Romero. *Id.* at 92. Multiplying plaintiff's lost annualized earnings of $22,780.74 by the 3.23 years that passed between the accident and plaintiff's examination with Dr. Romero, Dr. Page thus reaches a past wage loss of $63,566.27. *Id.* at 93. He did not calculate any future lost wages, based on Mr. Landry's finding that plaintiff could find light or medium duty employment that would fully replace her pre-accident regular income. *Id.* at 86.

### C. Damages

"The FTCA authorizes civil actions for damages against the United States . . . under circumstances in which a private person would be liable under the law of the state in which the negligent act or omission occurred." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003). Louisiana substantive law applies here. The court uses this law to analyze plaintiff's claims for past and future medical expenses as well as general damages.

In a tort case, the plaintiff generally has the burden of proving each element of her claim—including causation of damages—by a preponderance of the evidence. *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La. 1993). A plaintiff may recover for past and future

medical expenses caused by the defendant's tortious conduct. *Menard v. Lafayette Ins. Co.*, 31 So.3d 996, 1006 (La. 2010). The plaintiff must establish, however, that she "incurred past medical expenses in good faith as a result of [her] injury and future medical expenses will more probably than not be incurred." *Id.* The factfinder is given great deference in its assessment of quantum for both general and special damages. *Guillory v. Lee*, 116 So.3d 1104, 1116 (La. 2009). Where the finding is based on determinations relating to the credibility of witnesses, the award can only be overturned on a showing of manifest error. *Jones v. Bravata*, 980 So.3d 226, 233 (La. Ct. App. 1st Cir. 2019) (citing *Adams v. Rhodia, Inc.*, 983 So.2d 798, 806 (La. 2008)).

Under the parties' joint stipulation, plaintiff's medical bills total $170,811.31. *See* doc. 55. Plaintiff's recoverable medical expenses are limited to **$27,914.76** pursuant to a Medicaid lien and expenses not covered by Medicaid. *Id.* Although the government reserved the right to argue the relatedness of plaintiff's medical charges, it is unclear whether any of plaintiff's recoverable medical expenses are subject to reasonable dispute. Additionally, plaintiff has shown that all of the medical care described through the testimony and evidence in this matter was reasonably related to her upper and lower back complaints and exacerbated mental health issues following the accident. Accordingly, plaintiff is entitled to recover **$27,914.76** in past medical expenses.

As for past and future lost wages, the court agrees that plaintiff is unable to return to light or medium duty work as a result of the accident. Dr. Romero and Dr. Guthikonda reasonably opined that most individuals are not so disabled following this surgery and that plaintiff might benefit from a functional capacity evaluation to determine the extent of her

subjective pain complaints. But the opinion of Dr. Snider, who has treated plaintiff regularly and recorded her consistent complaints of lower back pain following the surgery, holds more sway in this regard. This is especially true in light of evidence regarding plaintiff's age, limited education and experience, and the low probability that she would qualify for other employment that would not require her to be on her feet for several hours a day. Accordingly, plaintiff is entitled to lost past and future wages.

At the same time, the court cannot credit that plaintiff would have worked 40 hours/week or to the age of 67 but for the accident. Plaintiff testified that she had worked as a bartender and helped out at her mother's restaurant. But she could only provide tax returns for less than two years of less than full-time employment for her entire adult life and had nothing other than her own testimony to show for the other work. Apart from conditions attributable to the accident, plaintiff's medical records show that she is a daily smoker and struggles with high blood pressure and high cholesterol. *See, e.g.*, doc. 64, att. 16, pp. 10–11. Given the physical nature of the jobs she has worked and the occupations available to her, according to her own experts, it is more reasonable to assume that she would have worked until age 61.38 at the latest. For past lost wages, the court uses the annualization of $22,780.74 calculated by Dr. Page because there is also no reasonable basis to assume plaintiff, who has not shown a record of regularly working full-time, would have begun to do so but for the accident. From the accident on August 23, 2021, to trial on May 11, 2026, 1722 days (4.72 years) elapsed. Multiplying this term by the annualized wage, the court determines that plaintiff is entitled to **$107,525.09** in past lost wages. For future lost wages, in the absence of any other figures from the government's economist,

the court will use the lower-end figure based on earnings of $10.21/hour to approximate plaintiff working less than full time at her previous wage of $12.50/hour. Plaintiff is thus entitled to **$225,665.63** in future lost wages.

As for general damages, the government limits its response to the "loss of enjoyment of life" aspect and does not offer any comparison cases on the quantum of general damages as a whole. The court's intention is to make one award for pain, suffering, and loss of enjoyment of life. Accordingly, the cases offered by the plaintiff provide a better starting point:

- *Clark v. Cotton*, 431 So.3d 11 (La. Ct. App. 3d Cir. 2026): **$1,153,000.00** in general damages for past pain, suffering, and disability, for a plaintiff who underwent a C6–C7 fusion following a neck injury in an interstate motor vehicle accident and could no longer work or enjoy his pre-accident hobbies. The plaintiff was also awarded $3.5 million in general damages related to future pain and suffering, but Ms. Silver only cites the past general damages as a point of comparison in this matter because the *Clark* plaintiff had a recommendation for future surgical treatment.

- *Logan v. Brink's, Inc.*, 16 So.3d 530 (La. Ct. App. 4th Cir. 2009): **$865,000.00** in general damages (**$1.35 million**[1] in 2026) for plaintiff who underwent triple fusion surgery and a second surgery to treat bone infection at the site of the fusion following a motor vehicle accident. Plaintiff testified

---

[1] Present-day figures were offered by plaintiff pursuant to the U.S. Department of Labor's Consumer Price Index Inflation Calculator. *See* https://www.bls.gov/data/inflation_calculator.htm.

Page 18 of 21

that he could no longer perform his pre-accident duties at his janitorial business and that his injuries also prevented him from socializing or participating in activities he had previously enjoyed.

- *Boutte v. Ace American Insurance Co.*, 416 So.3d 774 (La. Ct. App. 3d Cir. 2025): Jury award of **$825,000.00** in general damages to forklift driver injured in motor vehicle accident. At the time of trial plaintiff was recommended for a multi-level cervical discectomy fusion and his lumbar and cervical herniations had both progressed despite three years of treatment.

- *Baack v. McIntosh*, 304 So.3d 881 (La. Ct. App. 3d Cir. 2020): **$425,000.00** (**$524,215.58** in 2026) in general damages for plaintiff who experience severe lower back, hip, thigh, and leg pain after a motor vehicle accident. Plaintiff underwent lumbar surgery as a result of these injuries and was recommended to have another surgery. Even after surgery, his pain restricted him to light duty work; prevented him from having sexual intercourse with his wife, playing with his child, or helping with the house and yard; and made it impossible for him to participate in many of the recreational activities he had enjoyed before the accident.

- *Collatt v. Boudreaux*, 2019 WL 6482247 (La. Ct. App. 3d Cir. Nov. 25, 2019) (unpublished): General damages award increased to **$400,000.00** (**$521,170.41** in 2026) for plaintiff who underwent a two-level cervical discectomy and fusion for injuries suffered in a motor vehicle accident. The plaintiff testified that her pain improved after the surgery but was still so

extreme that she needed to use a walker and neck brace, sleep in a recliner, and use strong pain medication which caused memory loss and loss of energy. Plaintiff also testified that she began experiencing TMJ symptoms after the surgery.

Doc. 72, pp. 14–15.

These comparisons provide a useful starting point, but the court cannot justify so high an award in Ms. Silver's case. The plaintiffs in many of those matters experienced more dramatic accidents and injuries with more severe limitations on their lives. Ms. Silver's account of her own mental health history and her ex-husband's behavior from her April 2022 hospital admission suggest that her depression and anxiety do not wholly relate to the accident. Although Ms. Silver attributes her stress to her inability to work, she has little documented history of working before the accident. She has not received any other care for her back since the surgery, beyond medication management with her primary care physician. The fact that she is able to share household chores with her mother belies any notion that her pain is incapacitating, as it was for many of the plaintiffs in the comparison cases cited above. Lastly, the court credits Dr. Romero's position that her current neck pain is unlikely to be caused by the accident based on the November 2025 imaging and the absence of any significant complaints for two years. Although Dr. Snider testified that the MRI was consistent with her neck complaints, he did not relate the abnormalities therein to the accident. Accordingly, an award of **$250,000.00** is sufficient to compensate Ms. Silver for her past and future pain, suffering, and loss of enjoyment of life.

Page 20 of 21

### III.
#### CONCLUSION

For the reasons stated above, judgment will be entered for the plaintiff Stacy Silver in the following amounts:

- **$27,914.76** in past medical expenses

- **$107,525.09** in past lost wages

- **$225,665.63** in future lost wages

- **$250,000.00** in past and future pain, suffering, and loss of enjoyment of life

**THUS DONE AND SIGNED** in Chambers on the 8th day of July, 2026.

JAMES D. CAIN, JR.
**UNITED STATES DISTRICT JUDGE**